## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **ILCO SITE REMEDIATION GROUP,** | |
| **Plaintiff,** | |
| **v.** | **1:12-cv-00238-WSD** |
| **TARACORP, INC. and NK HOLDINGS, LLC,** | |
| **Defendants.** | |

## OPINION AND ORDER

This matter is before the Court on Plaintiff ILCO Site Remediation Group's ("Plaintiff" or "ILCO Group") Partial Motion for Summary Judgment [41], and Defendant NK Holdings, LLC's ("Defendant") (formerly Taracorp, Inc.) Motion for Summary Judgment [69], on Plaintiff's breach of contract claim.

## I.    BACKGROUND

### A.    Facts

Plaintiff is an unincorporated association of twenty-three companies that are potentially responsible parties ("PRPs") for the costs of remediation and removal of environmentally hazardous substances at the Interstate Lead Company

Superfund Site located at 1247 Borden Avenue, Leeds, Alabama, and related disposal locations (the "Site").  Defendant is a PRP for the Site and formerly was a member of the ILCO Group.

In 1997, the United States Environmental Protection Agency ("EPA") filed an action under Sections 101 and 107 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") for reimbursement of costs incurred for environmental response actions taken at the Site.  On April 22, 1997, the members of the ILCO Group, including Defendant, entered into a Consent Decree with the EPA providing for a Remedial Design/Remedial Action ("Remedial Work Plan") for the Site.  In October 1997, the members of the ILCO Group, including Defendant, entered into an agreement entitled "The ILCO Site Remediation Agreement" ("Agreement").  Defendant's Chief Financial Officer signed the Agreement on Defendant's behalf.  The Agreement sets forth procedures for coordinating and allocating costs associated with the Remedial Work Plan.  ILCO Group has spent millions of dollars on remedial work at the Site since the execution of the Consent Decree and the Agreement.  For about ten years, Defendant paid the pro rata amount assessed against it under the Agreement without raising any objections to its obligation to pay the assessments, the nature of the amount assessed or the allocation of its share of responsibility for the

Remedial Work Plan.  On December 22, 2008, Louis J. Taratoot, the owner of NK

Holdings LLC, wrote a letter to Plaintiff's counsel in which he stated:

> I have delayed responding to you in the hopes that [NK Holdings
> LLC] would be able to pay its $30,199.28 assessment by the end of
> the year.  Unfortunately, with the current state of the economy, [NK
> Holdings LLC] simply does not have sufficient cash flow to pay even
> a portion of the assessment at this time.
>
> Please be assured, however, that [NK Holdings LLC] wishes to
> continue to participate in the [ILCO Group] but must request that the
> payment of this assessment be deferred until such time as [NK
> Holdings LLC] has sufficient cash to pay the assessment in whole or
> in installments.

NK Holdings LLC subsequently made a partial payment to the ILCO Group

in the amount of $15,000 on its allocation in the December 2008 assessment.

From December 30, 2008, through June 20, 2011, ILCO Group issued Defendant

invoices for the assessments it was required to pay.  Defendant failed to make any

payments after December 30, 2008.

On July 14, 2011, Plaintiff declared Defendant in default under the

Agreement.  On September 7, 2011, Plaintiff removed Defendant from the ILCO

Group because of Defendant's continued failure to pay its share of the Remedial

Work Plan costs allocated to Defendant under the Consent Decree and the

Agreement.

B.    Procedural History

On January 24, 2012, Plaintiff filed a six-count (6) Complaint against Defendant seeking cost recovery and contribution pursuant to CERCLA, a declaratory judgment against Defendant for its liability to pay existing and future costs associated with the Remedial Work Plan, damages in excess of $119,699.18 for breach of contract, and attorneys fees.

On August 7, 2013, Plaintiff moved for partial summary judgment on its breach of contract claim, seeking damages in the amount of $267,480.36, plus interest for unpaid assessments owed from December 2008 through 2013, and a declaration that Defendant is responsible for paying its share of all future assessments pursuant to the Agreement.  On November 18, 2013, Defendant replied to Plaintiff's Partial Motion for Summary Judgment.[1]  Defendant argues that the Agreement is void for indefiniteness, and to the extent the Agreement is valid, Plaintiff has failed to show that the Agreement was breached.  On December 5, 2013, Plaintiff replied to the Defendant's Response to Plaintiff's Motion for Partial Summary Judgment.

---

[1] The delay in the response was allowed by the Court at the request of Defendant's counsel who was suffering from a significant medical challenge at that time.

On November 25, 2013, Defendant moved for summary judgment on the Plaintiff's CERCLA and breach of contract claims.  On November 27, 2013, the Court ordered the Plaintiff to file a response to the Defendant's Motion for Summary Judgment, if required, within thirty (30) days of the Court's ruling on Plaintiff's Motion for Partial Summary Judgment.  On March 10, 2014, the Court stayed this matter for thirty (30) days to allow Defendant to consider who it would retain to represent it in this action in light of the death of Defendant's lead counsel. On May 8, 2014, the Court lifted the stay and ordered the Plaintiff to file, on or before April 23, 2014, a response to Defendant's Motion for Summary Judgment on Plaintiff's breach of contract claim.  On April 23, 2014, Plaintiff replied to the Defendant's Motion for Summary Judgment on Plaintiff's breach of contract claim.

## II.   DISCUSSION

A.   <u>Legal Standard</u>

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record."  Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

      B.    Analysis

          *1.    Indefiniteness of Terms*

In interpreting a contract, the "words of the agreement will be given their ordinary meaning."  Hibbett Sporting Goods, Inc. v. Biernbaum, 391 So.2d 1027, 1029 (Ala. 1980) (internal citations and quotation marks omitted).  "Whether a contract is ambiguous is a question of law for the trial court to determine."  P & S Business, Inc. v. South Central Bell Tel. Co., 466 So.2d 928, 931 (Ala. 1985) (internal citations omitted); Food Service Distributors, Inc. v. Barber, 429 So.2d 1025, 1028 (Ala. 1983).  An "instrument is unambiguous if only one reasonable meaning clearly emerges."  Vainrib v. Downey, 565 So.2d 647, 648 (Ala. Civ. App. 1990).  "If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by summary judgment."  McDonald v. U.S. Die Casting & Development Co., 585 So.2d 853, 855 (Ala.1991) (internal citations omitted).

"A contract that leaves material portions open for future agreement is nugatory and void for indefiniteness." <u>Nihon Rufuto Co., Ltd. v. Nidek Medical Products, Inc.</u>, 437 F. App'x 782, 788 (11th Cir. 2011) (internal citations and quotation marks omitted).[2]  "A contract can lack definiteness as to the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement." <u>Id.</u>  Contractual terms, however, are "reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." <u>Id.</u>  For a contract to be void, "indefiniteness must reach the point where construction becomes futile." <u>Id.</u>  The Court "will, if possible, interpret doubtful agreements by attaching a sufficiently definite meaning to a bargain if the parties evidently intended to enter into a binding contract." <u>Id.</u>  "This is particularly true if the plaintiff has fully or partly performed because the performance may either remove the uncertainty or militate in favor of recovery even if the uncertainty continues." <u>Williston on Contracts</u> § 4:21 (4th ed. 2007).

---

[2] The Agreement provides that it is to be interpreted under Alabama law.  When a federal court decides a state law claim, whether acting pursuant to diversity or supplemental jurisdiction, it applies choice-of-law rules of the jurisdiction in which it sits.  <u>Trumpet Invs., N.V. v. Union Capital Partners I, Inc.</u>, 92 F.3d 1110, 1115 (11th Cir. 1996).  In Georgia, "[a]bsent a contrary public policy, [courts] will normally enforce a contractual choice of law clause." <u>Carr v. Kupfer</u>, 296 S.E.2d 560, 562 (Ga. 1982).

Defendant argues that the Agreement is void because it requires Defendant to pay assessments for an indefinite amount of time, the assessed amounts are uncertain and unpredictable, and Plaintiff has unfettered discretion to determine the amount necessary to fund the joint expenses required pursuant to the Remedial Work Plan.  The legal arguments raised by Defendant that challenge the validity of the Agreement are unconvincing.  The terms of the Agreement are reasonably certain to provide the Court with a "basis for determining the existence of a breach and for giving an appropriate remedy."  Nihon Rufuto Co., Ltd., 437 F. App'x at 788.  Nothing in the Agreement can be construed as indefinite "to the point where construction becomes futile."  Id.

The Court determines that the terms of the Agreement are unambiguous and are required to be enforced.  The Court specifically determines that the Agreement provides a basis for determining the existence of a breach, especially here where, once the Consent Decree was entered, the parties intended to enter into an Agreement by which the work required to be undertaken under the Remedial Work Plan would be allocated and paid by the members of the ILCO Group.  That the parties intended to be bound, and understood and accepted they would be assessed and required to pay allocation of the remediation costs until the Site was remediated, is evidenced by Defendant's payment of its remediation cost

assessments for over 10 years.  This decade long performance under the Agreement shows all of the parties to the Agreement, including Defendants, were certain of the performance required of them, including the performance required in the future.  Williston on Contracts § 4:21 (4th ed. 2007); see also Nihon Rufuto Co., Ltd., 437 F. App'x at 788.  Defendant cannot now claim otherwise to avoid its payment obligation.

"Parties to a contract may either prescribe a fixed term for its duration or may make it depend on some prescribed contingency."  Flowers v. Flowers, 334 So.2d 856, 858 (Ala. 1976) (quoting Phenix City v. Alabama Power Co., 239 Ala. 547, 195 So. 894 (1940)).  The Agreement, by its plain terms, provides that it "shall terminate upon completion of the RD/RA, acceptance thereof by [the] EPA, and the subsequent winding up of all business related to the RD/RA."  Agreement, page 18 at § 22.  This is not a case where the time required for performance is "unknown" or unspecified.  The Agreement expressly states that it is expected to terminate upon completion of the Remedial Work Plan, and the EPA's approval of a certification of completion submitted by the ILCO Group.  A "prescribed contingency" for the Agreement's termination is unambiguously provided in the Agreement.  Flowers v. Flowers, 334 So.2d at 858.

The Defendant's claim that the clause "winding up of all business related to the RD/RA" is an indefinite term also is not persuasive.  The ordinary meaning of the term "winding up" is "the conclusion of any action, activity, etc.,"[3] and the ordinary meaning of the term "business," in the context of the clause at issue, is a "matter, or matters to be attended to."[4]  The Court finds that the ordinary meaning of the phrase "winding up of all business related to the RD/RA" refers to the conclusion of all activities or matters related to the Remedial Work Plan.

The Agreement unambiguously provides that the parties' duty to pay remediation costs will terminate upon completion of the Remedial Work Plan, including all activities or matters related to the Remedial Work Plan, and the EPA's approval of a certification of completion submitted by the ILCO Group. Defendant's void for "indefiniteness" argument based upon the claim that there is no "definite time" for the contract's termination is thus unconvincing.  See Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co., 817 So.2d 687, 692 (Ala.2001) ("The fact that the parties interpret the insurance policy differently does not make the insurance policy ambiguous."); Wayne J. Griffin Elec., Inc. v. Dunn Constr. Co.,

---

[3] "wind up."  Dictionary.com.
http://dictionary.reference.com/browse/wind+up?s=t (July 3, 2014).

[4] "business."  Dictionary.com.
http://dictionary.reference.com/browse/business?s=t (July 3, 2014).

622 So.2d 314, 317 (Ala.1993) ("The mere fact that the parties argue different

constructions of the document does not force the conclusion that the disputed

language is ambiguous.").

Defendant next argues that the uncertain and unpredictable nature of the

assessments renders the Agreement indefinite.  Defendant essentially contends that

a promise to pay money to be held in reserve or a promise to set aside an amount

of money to meet a future obligation cannot form the basis of a valid contract

because the actual amount ultimately expended may vary from the amount set

aside as a reserve.  This argument also is unpersuasive.  Alabama law does not

require the Agreement to specify the actual costs of remediation, so long as there is

an agreed upon method by which the costs are estimated.  See Eufaula Hosp. Corp.

v. Lawrence, 32 So.3d 30, 33 (Ala. 2009) ("It is not, therefore, necessary that the

price should be fixed by the contract itself . . . provided that the parties have settled

upon some method by which the price may be determined with certainty") (internal

quotations and citations omitted); see also Southern United Fire Ins. Co. v. Knight,

736 So.2d 582, 585 n.2 (Ala. 1999) (observing that the absence of a specific

amount for the arbitrator's fees in a contract does not render the contract void for

indefiniteness or uncertainty because "Knight agreed to pay arbitrators' fees.

Whatever those fees were . . . [because] for a court to treat a contract as void on the

ground of uncertainty, the contract must be so vague and indefinite in its terms that the intention of the parties cannot be fairly and reasonably inferred from them . . . ") (internal citations omitted).

The Agreement provided, and the Executive and Technical Committees of the ILCO Group here used, a formula to estimate the assessed amount to be allocated to each Member.  The Defendant accepted that formula for more than 10 years, and for 10 years paid its allocated share to clean up the Site.  The Agreement also does not require the Defendant to pay any amount other than the actual costs of remediation because any funds remaining from prior assessments are carried forward to cover the assessments for the following year.  See Steinwurtzel Dep. at 51-52.  The Agreement expressly provides further: "If after the termination of the activities contemplated by this Agreement and payment of all administrative costs and RD/RA expenses associated with such activities a positive balance remains in the Fund, the balance shall be paid to the Members in proportion to their contribution relative to the total contributions made by all Members."  Agreement, page 7 at § 4(h).  In short, the Agreement requires the payment of only "actual costs" because all contributions made to the Remediation Work Plan that are not expended are returned to the Members at the conclusion of the Agreement.

Defendant's claims regarding the "unpredictability" and "uncertainty" of the assessments also contradict the plain terms of the Agreement.  The Agreement requires that "the members shall jointly *fund* and *pay* expenses incurred for services performed for the benefit of the Members as a group."  Agreement, page 3 at § 3(a) (emphasis added).  The common definition of the word "fund" is a "reserve of money, etc., set aside for a certain purpose."[5]  That is precisely what the assessments are designed to accomplish.  The assessments are a reserve of money paid by the Members in advance to meet future obligations that are incurred for services performed on the Site.  Defendant understood that the Agreement required the Members of the ILCO Group to pay yearly assessments in advance.  The obligation for each ILCO Member to pay the allocated share of the reserve was a specific term to which Defendant agreed.

  The Court notes that the record shows that the ILCO Group obtained the EPA's approval to make various expense savings changes to the Remedial Work Plan, which saved the Members nearly $87 million in remediation costs that would otherwise have to be incurred to clean up the Site.  <u>See</u> Leed Dep. at 56-59, 77, 89, 160-161, 168-69.  The variance between the assessments and the actual costs

---

[5] "fund."  Dictionary.com.  <u>http://dictionary.reference.com/browse/fund?s=t</u> (July 3, 2014).

incurred for the Remedial Work Plan thus substantially reduced the Defendant's financial obligations under the Agreement and the Consent Decree.

Defendant next asserts that the ILCO Group had "unfettered discretion" to determine the nature of the Members' obligations, and for that reason the Agreement is not enforceable. The Agreement, however, plainly vests in the Technical Committee the duty to determine the work to be performed to comply with the Consent Decree. Defendant agreed to this contract term and, in fact, served on the Technical Committee from 2000-2010. As a member of the Technical Committee, Defendant evaluated the costs to clean up the Site, and made recommendations regarding remediation to the Executive Committee. The Executive Committee of the ILCO Group is empowered to determine the assessments as "necessary to fund Joint Expenses," consistent with the requirements of the Consent Decree and the EPA. This is not a case where a single party to a contract has "unfettered discretion" to direct the performance of another party.

The Court concludes that the Agreement is a valid contract with reasonably certain terms that provide a basis for determining that Defendant has breached the Agreement, and Defendant is liable to the Plaintiff for damages in the amount of $267,480.36, plus interest, for unpaid assessments owed from December 2008

15

through 2013.  Even if the Court assumes that the terms of the Agreement are uncertain, which they are not, Defendant's performance on the contract for over 10 years entitles Plaintiff to relief because any uncertainty is resolved by Defendant's acceptance of the terms and performance. [6]

### 2.   Breach of Contract

Defendant next argues that it did not breach the Agreement because the "assessments do not reflect actual costs incurred by the ILCO Group or services provided."  Def.'s Response to Plf.'s Partial Mot. for Summ. J. at 11.  The Court considered and rejected this argument as contrary to the plain terms of the Agreement that unambiguously require the Defendant to pay assessments in advance for the Remedial Work Plan.  See Section II(B)(1) of this Order.

---

[6] The undisputed evidence in this case shows that towards the end of 2008, Defendant refused to accept responsibility and pay for its share of the assessments for the Remedial Work Plan because Defendant determined that it would be financially burdensome to comply with its obligations under the Agreement.  The Agreement provides Members of the ILCO Group with a mechanism to alleviate the financial burden imposed by an assessment, including an examination of financial records to confirm that the Member is eligible for relief based on its inability to pay an annual assessment.  The Agreement also allowed a Member of the ILCO Group to challenge its share of assessments within 30 days of signing the Agreement or becoming a Member of the ILCO Group.  Defendant did not invoke these contract provisions to seek relief from paying its share of the assessments, which it had paid for 10 years.

Defendant asserts that "it is highly unlikely that such vague, uncertain estimates of potential future costs constitute necessary costs that 'were incurred' or that cost estimates for work never completed would constitute 'services performed.'"  Def.'s Response to Plf.'s Partial Mot. for Summ. J. at 11-12. Defendant further asserts: "given that none of the work estimated to take place actually occurred, however, it seems likely that these oversight costs would also have been drastically diminished."  Id.  Defendant's arguments are based on conjecture and speculation.  "Speculation does not create a *genuine* issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment."  Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (quoting Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 931-32 (7th Cir. 1995) (emphasis in original)). "Although '[a]ll reasonable inferences arising from the evidence must be resolved in favor of the non-movant' on a motion for summary judgment, 'inferences based upon speculation are not reasonable.'"  Sims v. Nguyen, 403 App'x 410, 412 (11th Cir. 2010) (quoting Marshall v. City of Cape Coral, Florida, 797 F.2d 1555, 1559 (11th Cir. 1986)).

Defendant relies on the testimony of Steinwurtzel and Leed to claim that the record reflects that "no accounting was ever made in order to determine whether costs assessed were actually incurred, or what alternative costs may have been

incurred."  Def.'s Response to Plf.'s Partial Mot. for Summ. J. at 13.  Defendant's

interpretation of the testimony is illogical.  On October 23, 2013, Leed testified as

follows:

> Q:  Did you ever make an accounting or statements of a cost, of the
> costs that were actually incurred in any given year?
>
> A:  Yes, I keep records of actual costs, yes.
>
> Q:  How do you keep those records in terms of, or how do you
> organize the records, do you make a spreadsheet?
>
> A:  Yes, it's a one-page spreadsheet.  Down the left side I have for
> any given calendar year the month, you know, January through
> December, and across the top of the page I have a listing of the
> different consultants, contractors, and so forth that perform work at
> the site.  And when an invoice comes in I just keep a record of the
> total amount of the invoice on the spreadsheet.

Leed Dep. at 93-94.

On October 24, 2013, Steinwurtzel testified as follows:

> Q:  Let me rephrase it, or is there any spreadsheet or central chart
> where you have an item for 2009 budget, budgeted costs, and next to
> it 2009 actual cost, so you can in one place at a snapshot you can
> sort of a comparison between the budgeted costs for any given year
> and the actual costs?
>
> A:  No.
>
> Q:  I assume that is something that someone could create just based on
> invoices and the data that is out there, if someone wanted they could?
>
> A:  Yes.

Q:  I would assume so, but between the ledgers and then my secretary prepared for me on a quarterly basis a summary of the financials for the Group, so, yes we track it pretty well, but not in the form that you just described.

Steinwurtzel Dep. at 60-61.

The evidence cited by Defendant unequivocally shows that Plaintiff tracked and accounted for the actual costs on a yearly basis even though it may not have created and retained a document that represented budgeted and actual costs for the year.

Finally, Defendant argues that Plaintiff's breach of contract claim fails as a matter of law because the assessments are not reasonable and necessary.  There is no support for this claim.  The Members of the ILCO Group agreed to "raise and spend all reasonable and necessary funds to implement" the Remedial Work Plan.  Agreement, at page 3, § 2(a)(v).  Defendant notes that the total amount for the assessments from 2009-2013 was nearly $3 million, but the ledger of invoices shows that the actual costs for those same years totaled approximately $1.8 million.  This supports Plaintiff's claim that the ILCO Group reduced Defendant's financial responsibility under the Consent Decree by managing the Remedial Work Plan in an economical manner, and by negotiating with the EPA to implement cost-effective alternative remedies to clean up the Site.  The amount of the reserve changed over time because of the ILCO Group's efforts towards cost reduction to

19

implement the Remedial Work Plan.  Leed Dep. at 160-163.  The assessments were not "unreasonable" or "unnecessary" at the time they were estimated, and Defendant has not presented any evidence to discredit that conclusion.  The Agreement restricts the total amount required to be paid by the Members of the ILCO Group to "actual costs" for the remediation given that unexpended reserves are carried forward into future years, and the ILCO group members are entitled at the Agreement's conclusion to a refund of any amounts not expended.

The specific issues raised by the Defendant to support its claim that the assessments were unreasonable and unnecessary reiterate the flawed argument that the Agreement is void due to the unpredictability and uncertainty of the assessments.  The Court has ruled that unpredictability and uncertainty do not render the Agreement invalid because Defendant agreed to fund a reserve of money to pay for a future obligation to implement the Remedial Work Pan.  For the same reasons, the Court rejects Defendant's contention that the expenses required to be paid in advance were unreasonable or unnecessary.[7]

---

[7] The Court also concludes that Defendant's belated claim regarding the unreasonableness of the assessments is not credible given that it was a member of the Technical Committee from 2000-2010.  As a member of that Committee, Defendant received detailed information on the assessments and the Remedial Work Plan, evaluated the costs to clean up the Site, and made recommendations regarding remediation to the Executive Committee.  In other words, Defendant approved the assessments as "reasonable" and "necessary" expenses to implement

In its Motion for Summary Judgment on Plaintiff's breach of contract claim, Defendant asserts that the assessments are not "reasonable and necessary as contemplated by CERCLA and the [National Contingency Plan]."[8]  This argument is irrelevant to Plaintiff's breach of contract claim because the Agreement vests the Executive Committee of the ILCO Group with broad authority to "rais[e] and spen[d] (and authori[ze] expenditures of) all reasonable and necessary funds to implement its powers, duties, and responsibilities," including "legal, technical, administrative, oversight, and other costs incurred in connection with the" Remedial Work Plan.  Agreement, page 1, page 3 at § 2(a)(5), page 9 at § 6(b)(xiii).  Nothing in the Agreement limits the amount expended on the Remedial Work Plan to the costs contemplated by CERCLA or the NCP.  It is the Remedial Work Plan that the parties to the Agreement were obligated and agreed to fund.

---

the Remedial Work Plan, and its belated objection is a pretextual strategy to avoid its financial obligations under the Agreement.

[8] The Court did not consider Defendant's Motion for Summary Judgment on Plaintiff's claims under CERCLA because it relieved the parties from fully briefing this claim during the Court's April 16, 2014, telephone conference.  Plaintiff shall advise the Court promptly whether it intends to pursue its CERCLA claim.  If it does, the Court will require the parties to complete their briefing on Defendant's Motion for Summary Judgment on the CERCLA claim.

### III.   CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Partial Motion for Summary Judgment on its breach of contract claim is **GRANTED** [41].

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's breach of contract claim is **DENIED** [69].

**IT IS FURTHER ORDERED** that Defendant is liable to Plaintiff for damages in the amount of $267,480.36, plus interest, for unpaid assessments owed from 2008 through 2013, and Defendant is responsible for paying its share of assessments made under the Agreement after 2013, and which may be made in the future.

**SO ORDERED** this 10th day of July 2014.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE